MAUREEN MUNDELL, a Minor, by Cynthia Mundell, her Mother and Next Friend, Plaintiff-Appellant, v. ROBERT LA PATA, Defendant-Appellee.

First District (1st Division)   No. 1—92—1245

Opinion filed May 23, 1994.

Robert W. Karr & Associates, Ltd., and David A. Novoselsky & Associates, both of Chicago (David A. Novoselsky, of counsel), for appellant.

Hinshaw & Culbertson, of Chicago (Stephen R. Swofford, of counsel), for appellee.

JUSTICE O'CONNOR delivered the opinion of the court:

In July 1985, plaintiff, Cynthia Mundell, filed a two-count medical negligence suit against defendant Robert La Pata, M.D., on behalf of her daughter, Maureen, alleging that Dr. La Pata was negligent in both prenatal and neonatal care of her and Maureen, resulting in injury to Maureen.

Maureen Mundell was born on March 9, 1981, with a "brachial plexus" injury to her right arm. Brachial plexus is a paralyzing injury to the nerves which exit the spinal chord and run down the arms. Maureen apparently incurred this injury during birth, the result of emergency measures taken by Dr. La Pata to deliver her in the face of a complication called "shoulder dystocia." Shoulder dystocia, a condition in which a newborn's shoulder becomes lodged against the mother's pelvic bone, is a life-threatening complication of delivery in that when it occurs, the baby becomes stuck in the birth canal and its lungs, as well as the umbilical cord, become compressed in the birth canal, restricting breathing. The resulting risk of asphyxiation requires delivery to be effected within five minutes of the onset of shoulder dystocia.

Mrs. Mundell alleged that while she was pregnant with Maureen, she contracted gestational diabetes, a form of diabetes which affects pregnant women and then often disappears after delivery. Gestational diabetes can first be detected sometime between the 24th and 28th week of the pregnancy. This manifestation of the disease often results in a fetal condition called "macrosomia," or a larger

than normal—over nine pounds—baby. Diabetes-induced macrosomia generally results in fetal largeness below the neck. Macrosomia can result in "cephalopelvic disproportion," a disproportion in the size of a fetus to the mother's birth canal, *i.e.*, the baby is too large to be born "spontaneously," without medical intervention. A possible complication of cephalopelvic disproportion is shoulder dystocia. The medical response to cephalopelvic disproportion includes delivery by cesarean section.

Mrs. Mundell's complaint was predicated upon her claim that she was a gestational diabetic. Count I of the complaint alleged specific negligent acts by Dr. La Pata in that he:

a. failed to establish a diagnosis of gestational diabetes during the prenatal period;

b. failed to recognize cephalopelvic disproportion; and

c. effected a traumatic delivery.

Count II stated a claim under a theory of *res ipsa loquitur*, alleging that brachial plexus injuries do not ordinarily occur during delivery in the absence of negligence. At trial, the primary witnesses were Cynthia Mundell, Dr. La Pata, and two medical experts.

Cynthia Mundell's mother had suffered from diabetes. However, it was controlled by diet, rather than by insulin injections. The family also had a history of large babies. She began seeing Dr. La Pata for obstetric care when she discovered her pregnancy. She related her family history to Dr. La Pata. She visited Dr. La Pata on a monthly basis early in her pregnancy. Dr. La Pata performed urinalysis, took her blood pressure, and weighed her. As the pregnancy progressed, Cynthia became concerned that the fetus was a large one. After examinations at various points during the pregnancy, Dr. La Pata assured her that the fetus was of normal size.

Dr. La Pata recalled that Cynthia Mundell first visited him about her pregnancy on August 4, 1980. It was her first pregnancy, and she was 30 years old. Dr. La Pata took a family history and discovered that Cynthia's mother was a diet-controlled diabetic. On September 20, 1980, he gave Cynthia a complete physical examination, which was normal in all aspects. During the course of the pregnancy, Cynthia visited the doctor on approximately 12 occasions. On nine of these occasions, Dr. La Pata tested Cynthia's urine for glucose. The results were always negative, which is one indication that the patient does not have diabetes, although urinalysis is not a conclusive test.

Dr. La Pata listed the following among the factors indicating a patient's risk for gestational diabetes: (1) a family history of diabetes; (2) a prior pregnancy involving a macrosomic baby; (3) a history of fetal trouble; (4) a positive screening blood sugar test; (5) glucose in

the urine; (6) the current fetus is overly large; and (7) obesity in the mother. Dr. La Pata stated that unless two of these risk factors are present, he does not conclusively test a woman for gestational diabetes.[1] Thus, because the only risk factor that Cynthia Mundell presented to Dr. La Pata was a family history of diabetes, he never conducted conclusive screening testing for gestational diabetes because he believed her risk level for the disease to be very low. He stated that this satisfied the standard of care for obstetricians in the Chicago area in 1981.

At only one point during the pregnancy, in October 1980, did Dr. La Pata become concerned about the size of the baby. At that time, he ordered ultrasound, from which he concluded that the fetus was of normal size. As far as Dr. La Pata was concerned, Cynthia's pregnancy proceeded normally until delivery. On March 9, 1981, Cynthia was admitted to Evanston Hospital, for delivery at 12:30 p.m. She proceeded through labor without incident until about 6 p.m., when Maureen's head began to emerge from the birth canal. At this point, Cynthia was no longer able to push Maureen out on her own. An anesthetic was administered. Dr. La Pata then began delivering Maureen using a "low forceps" method. Dr. La Pata got the baby's head out, but it then retracted. This is known as the "turtle effect," which indicates shoulder dystocia.

Dr. La Pata and the attending staff started emergency measures to effectuate Maureen's birth. As the anesthesiologist applied pressure to Mrs. Mundell's abdomen, Dr. La Pata reached inside the birth canal and grabbed Maureen's lodged arm and turned it against her chest, rotating the affected shoulder away from the pelvis, so he could slide her from the birth canal. When she was delivered, her right arm hung limp. She was diagnosed as having incurred a form of brachial plexus injury known as Erb's palsy.

John Masterson, M.D., was plaintiff's expert witness. He testified about the complications of gestational diabetes and about the standard of care regarding obstetric care in Chicago during 1980-81. Masterson stated that the incidence of macrosomia in all pregnancies was 15 in 10,000 or .15%; however, in patients with gestational diabetes, that incidence rises to 170 in 10,000, or 1.7%. If gestational diabetes is treated, the incidence of macrosomia drops to the average. The incidence of shoulder dystocia in all pregnancies is 17 in 10,000 or .17%; however, in macrosomic infants, the incidence of shoulder

---

[1]Conclusive screening would consist of having the patient drink a glucose solution and thereafter checking the patient's blood-glucose level over the next several hours, at one-hour intervals.

dystocia is 2,000 in 10,000, or 20%. Brachial plexus injuries also occur in roughly 20% of macrosomic babies and less than 1% of non-macrosomic babies. Shoulder dystocia occurs in cases of cephalopelvic disproportion at a rate 25 times greater than in nondisproportional pregnancies. Twenty percent of infants whose birth involves the complication of shoulder dystocia die during delivery.

Dr. Masterson testified that, among all factors, the most important factor in determining risk for gestational diabetes is maternal diabetes. The age of the person at risk is also a factor because if one is at risk for diabetes and has not yet contracted it, the risk for it grows as the person ages. Dr. Masterson also noted the other factors testified to by Dr. La Pata. Under the standard of care in Chicago during 1981, given Cynthia Mundell's history of maternal diabetes, Dr. Masterson stated that Dr. La Pata should have tested Cynthia Mundell for gestational diabetes. The urine screening that Dr. La Pata ordered was of no value in determining whether Mrs. Mundell had gestational diabetes. Because Maureen Mundell was not hypoglycemic just after her birth, as are most babies of gestational diabetics, he could not conclude from her condition that Mrs. Mundell was a gestational diabetic. Nonetheless, concluding from all the factors involved in the case that she suffered from the disease during the pregnancy, Dr. Masterson offered that had Dr. La Pata diagnosed and controlled gestational diabetes, the delivery complications would likely not have occurred.

Dr. Masterson also concluded that Dr. La Pata failed to detect cephalopelvic disproportion at the time Cynthia went into labor after admission to the hospital. Had he done so, he could have performed a cesarean section to avoid the shoulder dystocia and resultant brachial plexus.

Dr. Masterson testified that in a vertex delivery, *i.e.*, one without complications, a brachial plexus injury does not ordinarily occur absent negligence. He did not state, nor was he asked, whether brachial plexus injuries ordinarily occur in the absence of negligence in a birth complicated by shoulder dystocia. Dr. Masterson did not testify that Dr. La Pata did not comply with the standard of care in applying the maneuvers he chose to deliver Maureen, once he had discovered the shoulder dystocia. In fact, the "corkscrew" method used by Dr. La Pata was among the acceptable methods. Other acceptable methods included purposeful fracturing of the clavicle or severing the clavicle using special scissors. In any event, one can accomplish all acceptable maneuvers to relieve shoulder dystocia in a nonnegligent manner and Erb's palsy is still a possible result.

Stanley Gall, M.D., testified as an expert on behalf of Dr.

La Pata. He concluded that the standard of care in 1981 in the Chicago area did not require testing for gestational diabetes under the circumstances of this case. Dr. Gall stated that only if Cynthia Mundell's mother's diabetes had been insulin-controlled, rather than diet-controlled, would he have concluded that Dr. La Pata should have tested Cynthia for gestational diabetes. Dr. Gall testified that because Cynthia had no prior pregnancy history and was not spilling sugar in her urine tests, there was no professional standard requiring Dr. La-Pata to conduct conclusive screening for gestational diabetes. Dr. Gall also concluded that Mrs. Mundell did not suffer from cephalopelvic disproportion at any time during her labor. Finally, like Dr. Masterson, he testified that based on Maureen's condition when she was born, there was no evidence to suggest that Mrs. Mundell was suffering from gestational diabetes.

At the close of the evidence, Dr. La Pata moved for a directed verdict on the *res ipsa loquitur* count of the complaint. The trial court granted this motion after lengthy argument. The case went to the jury on the theories that (1) Dr. La Pata failed to test and diagnose gestational diabetes in Cynthia Mundell, and (2) Dr. La Pata failed to recognize and manage cephalopelvic disproportion. The jury found in Dr. La Pata's favor. Cynthia Mundell appeals.

■ Mrs. Mundell argues that the trial court erred in permitting Dr. Gall to testify as an expert because he was not qualified to testify as to the obstetrical standard of care in Chicago in 1980-81 and that Dr. Gall misled the jury by inaccurately testifying as to the standard of care.

Dr. Gall is licensed to practice medicine in Illinois and is board-certified in obstetrics, gynecology, and in maternal fetal medicine. He completed his residency at the University of Minnesota. He received his board certification in obstetrics in 1968 and was recertified in 1979. He is also licensed to practice medicine in North Carolina, Kentucky, and Minnesota. Dr. Gall was a professor of obstetrics and gynecology at Duke University in 1980-1981 and at the University of Illinois, Chicago, from 1984-1989. He had also practiced medicine in Louisville, Kentucky, prior to Maureen's birth. Nonetheless, plaintiff claims that because he had not practiced in Illinois prior to Maureen Mundell's birth, he was not qualified to testify to the local standard of care as of 1981.

During trial, Mrs. Mundell failed to object to Dr. Gall's qualifications to testify as to the standard of care. Therefore, the issue is waived for purposes of appeal. (*Brown v. Timpte Inc.* (1985), 137 Ill. App. 3d 1053, 1063, 485 N.E.2d 488.) Furthermore, we find no plain error in permitting Dr. Gall to testify. In order to find plain error,

this court must find that any error "was so egregious that it deprived the complaining party of a fair trial and substantially impaired the integrity of the judicial process." (Emphasis omitted.) *Gillespie v. Chrysler Motors Corp.* (1990), 135 Ill. 2d 363, 377, 553 N.E.2d 291.

As long as a physician meets the foundational requirements for testifying as an expert, this court will not overturn a trial court's decision to permit a witness to so testify absent an abuse of discretion. (*Jones v. O'Young* (1992), 154 Ill. 2d 39, 43, 607 N.E.2d 224.) In order to be certified as an expert, a witness must be (1) a licensed member of the area of medicine about which he is to testify; and (2) must show that he is familiar with the methods, procedures and treatments ordinarily observed by other physicians in either the defendant's community or in a similar community. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 243, 489 N.E.2d 867.) Plaintiff challenges the second of these criteria.

Dr. Gall was on the faculty of a university medical center of repute and practiced in major metropolitan areas in the United States during the period leading up to and including Maureen's birth. Based on his experience and on the fact that the examination given to obstetricians to achieve board certification is a national examination, Dr. Gall testified that the standards applicable to obstetricians and gynecologists were national standards. Indeed, plaintiff's expert, Dr. Masterson, testified that all obstetricians follow similar standards. In *Purtill*, our supreme court recognized that some standards of medical practice are not locality based. Thus, if the testimony establishes that a standard of care is one followed by all doctors in the country, then a witness may testify as an expert even if he has not practiced in the community because he is thus aware of the standard in a similar community. (*Purtill*, 111 Ill. 2d at 250.) Given the statements by Dr. Gall and Dr. Masterson, we conclude that the standards regarding obstetricians were of a national character and that Dr. Gall was qualified to testify as an expert because he was familiar with the 1981 standard of care in a community similar to Chicago.

■ The second part of plaintiff's contention is that Dr. Gall misstated the standard of care, when, as part of his answer, he testified that "It's a difficult concept, but it would mean—to me it means as it does to many people—it's a minimum type of standard which a physician should adhere to deliver the quality of care." Plaintiff contends that Dr. Gall's use of the word "minimum" understates the standard because a doctor is required to apply the "reasonable skill and care which a physician in good standing in the community would use in similar cases and circumstances." Minimum means "least," and thus is less than "reasonable."

In rejecting plaintiff's argument, the trial court stressed that the jury was properly instructed as to the standard of care. Second, the court noted that during closing argument, both counsel referred to the correct standard of care. Third, the trial court did not believe that Dr. Gall's use of the word "minimum" misstated the standard of care and that plaintiff was taking the word "minimum" out of context. Rather, the trial court believed that in using the word "minimum," Dr. Gall was referring to the level of care below which a doctor could not perform and still satisfy the standard of care. We agree with the trial court's assessment of Dr. Gall's testimony. Indeed, we note that on cross-examination, plaintiff's counsel, in an attempt to discover what Dr. Gall meant by "minimum," asked him the following question:

"Q. In other words, the physician is not expected to meet the standard of care which reasonably well-qualified physicians practicing in the same or similar community would follow?"

To which Dr. Gall responded:

"A. I think we're talking about the same thing. I think you're trying to split hairs.

In fact, the law says something about well-qualified. I say there is a level or a standard, if you will, [below which] everybody would agree that would not be good practice.

And therefore, in this area, in the area of a standard there is a wide range of practice possible in most situations."

This exchange supports the trial court's view of Dr. Gall's testimony. Furthermore, any confusion Dr. Gall's brief mention of the word "minimum" might have engendered was certainly cured by his response to the question posed.

■ Mrs. Mundell next contends that the trial judge erroneously granted defendant's motion *in limine* which led to the exclusion of Dr. Masterson's testimony that he had based his conclusion that Mrs. Mundell was a gestational diabetic during her pregnancy with Maureen on the fact that she tested positive for gestational diabetes when she gave birth to her second child, four years and nine months after Maureen was born. The trial court ruled that the evidence of gestational diabetes during the succeeding pregnancy, by itself, lacked relevance because of its remoteness in time to Maureen's birth. However, Mrs. Mundell contends that because Dr. Masterson relied on the subsequent finding of gestational diabetes to reach his conclusion that she suffered from it during Maureen's birth, it was error to exclude the evidence because an expert may give an opinion as to facts not in evidence if they are of the type reasonably relied upon by experts in the field in forming their opinion. See *Melecosky v. McCarthy Brothers Co.* (1986), 115 Ill. 2d 209, 216, 503 N.E.2d 355.

The rule permitting an expert to explain the basis of his opinion is not without limitation. Our supreme court has held that a trial court "need not allow an expert to state the underlying facts or data of his opinion 'when [their] probative value in explaining the expert's opinion pales beside [their] likely prejudicial impact.' " (*City of Chicago v. Anthony* (1990), 136 Ill. 2d 169, 185, 554 N.E.2d 1381, *cert. denied* (1990), 498 U.S. 900, 112 L. Ed. 2d 214, 111 S. Ct. 256, quoting *People v. Anderson* (1986), 113 Ill. 2d 1, 12.) It is for the trial court to make this determination, and we will not disturb the trial court's decision to exclude Dr. Masterson's testimony absent an abuse of discretion. *Anthony*, 136 Ill. 2d at 186.

One of the issues at trial was whether Dr. La Pata should have tested Mrs. Mundell for gestational diabetes. Because Mrs. Mundell's second child had not been born yet when Dr. La Pata treated Mrs. Mundell, it would have been extremely prejudicial to permit testimony by Dr. Masterson asserting that because Mrs. Mundell contracted gestational diabetes during her second pregnancy, she should have been tested for it during the first pregnancy. Indeed, in denying the post-trial motion, the trial court stressed that the prejudice inherent in this testimony outweighed any relevance it might possess. The trial court noted that Dr. La Pata did not have the luxury of hindsight when he treated Mrs. Mundell. The trial court also emphasized that Dr. Masterson testified in his deposition that a woman may have one or more pregnancies without contracting gestational diabetes and then contract it in a later pregnancy. Thus, the evidence of subsequent gestational diabetes had little if any bearing on Mrs. Mundell's condition in 1981. The trial court did not abuse its discretion in granting the motion *in limine*.

■ Plaintiff claims that the trial court erred in granting defendant's motion for a directed verdict on plaintiff's *res ipsa* count. A trial judge may enter a directed verdict at the close of evidence if all of the evidence, when viewed in a light most favorable to the non-moving party, so overwhelmingly favors the movant that no contrary verdict could stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.

The doctrine of *res ipsa loquitur* affords a plaintiff a permissible inference that a defendant acted negligently if the plaintiff can establish (1) that the instrumentality which caused the injury to plaintiff is under the control or management of the party charged with negligence, and (2) that the occurrence was one that in the ordinary course of events would not have happened had the defendant exercised due care. (*Gatlin v. Ruder* (1990), 137 Ill. 2d 284, 295, 560 N.E.2d 586; *Metz v. Central Ill. Electric & Gas Co.* (1965), 32 Ill. 2d

446, 448-49, 207 N.E.2d 305.) The trial court ruled that plaintiff failed to establish the second element of the *res ipsa* standard.

In attempting to establish the second prong of the *res ipsa* doctrine, plaintiff's counsel posed the following questions to Dr. Masterson:

"Q. Do you have an opinion, based upon a reasonable degree of medical certainty, whether a brachial plexus injury ordinarily occurs in a vertex or headfirst delivery in the absence of negligence or in the absence of a departure from the standard of care by the delivering physician?

A. That would be extremely rare.

Q. In your opinion, does that injury then not ordinarily occur in the absence of negligence?

A. Right."

As defendant points out, and as the trial court ruled, this set of questions does not pose the appropriate scenario. Mrs. Mundell's delivery was not a vertex delivery. Rather, it was a low-forceps delivery involving shoulder dystocia. A more appropriate question would have been "whether a brachial plexus injury ordinarily occurs in the absence of negligence in a delivery involving shoulder dystocia." The statistical data provided by Dr. Masterson demonstrate the importance of the distinction.

Dr. Masterson testified that brachial plexus injuries were possible in a birth involving shoulder dystocia even if the delivery physician addressed the shoulder dystocia in a nonnegligent manner. In fact, his testimony indicates that the incidence of shoulder dystocia in all pregnancies is 17 in 10,000 or .17%; however, in macrosomic infants, like Maureen, the incidence of shoulder dystocia is 2,000 in 10,000, or 20%. Brachial plexus injuries occur in roughly 20% of macrosomic babies and less than 1% of nonmacrosomic babies. Dr. Masterson's testimony shows that in deliveries involving shoulder dystocia, brachial plexus injuries are not an uncommon occurrence because most shoulder dystocia and brachial plexus injuries occur in macrosomic babies. Thus plaintiff did not establish, either by directly posing the *res ipsa* question to Dr. Masterson, or by statistical evidence, that brachial plexus injuries do not ordinarily occur absent negligence in a birth involving shoulder dystocia.

Furthermore, Dr. Masterson's criticism of Dr. La Pata's performance was limited to his decisions prior to his discovery of shoulder dystocia, *i.e.*, Dr. La Pata should have tested Mrs. Mundell for gestational diabetes and failed to diagnose cephalopelvic disproportion. In reviewing Dr. La Pata's course of conduct, he did not testify that the fact of Maureen's brachial plexus indicated negligence, as

*res ipsa* requires. Indeed, he established to the contrary when he testified that one can accomplish all acceptable maneuvers to relieve shoulder dystocia in a nonnegligent manner and brachial plexus still may result. Furthermore, the method Dr. La Pata used to deliver Maureen was an acceptable method, the execution of which Dr. Masterson offered no criticism. Our review of Dr. Masterson's testimony indicates that "his opinion was formed on the basis of his knowledge of the treatment that was actually performed." (*Daly v. Carmean* (1991), 210 Ill. App. 3d 19, 26-27, 568 N.E.2d 955, *appeal denied* (1991), 141 Ill. 2d 538, 580 N.E.2d 110.) When liability in a medical malpractice case is predicated upon the selection of treatment and the parties are not in dispute as to the treatment actually performed, *res ipsa* simply does not apply: "[t]o permit use of *res ipsa* here *** would permit its use in the vast majority of cases where the propriety of the selection of medical treatment was the issue." (*Carmean*, 210 Ill. App. 3d at 27.) The trial court correctly directed a verdict in favor of Dr. La Pata on the *res ipsa* count.

■ Plaintiff's final contention is that defense counsel failed to complete an attempted impeachment of Dr. Masterson, plaintiff's expert witness. The gist of the claim is that defense counsel failed to authenticate testimony by Dr. Masterson from a previous trial with which defense counsel had impeached Dr. Masterson's testimony in this trial.

In denying plaintiff's post-trial motion, the trial court ruled that plaintiff had waived the issue by failing to object to defense counsel's action and by failing to file a motion to strike the testimony. Under our supreme court's decision in *Gillespie v. Chrysler Motors Corp.* (1990), 135 Ill. 2d 363, 374, 553 N.E.2d 291, the plaintiff's failure to object and present a motion to strike precisely this type of testimony constitutes a waiver of the issue for purposes of appeal. In *Gillespie*, defendant introduced testimony regarding the contents of a nurse's note, but failed to call the nurse to authenticate the note. In substance, that is the error of which plaintiff complains. Under *Gillespie*, plaintiff has waived the error. Furthermore, *Gillespie* holds that this type of error does not rise to the level of plain error. *Gillespie*, 135 Ill. 2d 375-77.

Affirmed.

CAMPBELL, P.J., and BUCKLEY, J., concur.