Billings, Thomas P., J.
For the reasons that follow, the Defendants’ Motion to Preclude Testimony of Plaintiffs Expert Stuart Edelberg, M.D., based on Daubert v. Dow Chemical and Commonwealth v. Lanigan, is DENIED.
BACKGROUND
A. The Facts
On November 15, 2001 Jill Cardillo, then 40 weeks pregnant with her first child, was admitted to Newton-Well esley Hospital for induction of labor. Her obstetrician, a Dr. Richer, ruptured her membranes at 8:40 a.m. The cervix was completely dilated at 3:51 p.m. An hour and three-quarters later, at 5:38 p.m., Mrs. Cardillo delivered a ten-pound, six-ounce baby girl, Angelina.
Dr. Richer did not perform the delivery, as he was busy delivering another baby. Dr. Aron was paged and entered the delivery room as Angelina was crowning. He delivered the head and noted that the baby’s chin was tight on the mother’s perineum. He attempted to complete the delivery with mild downward pressure. This was unsuccessful. Dr. Aron diagnosed a shoulder dystocia (baby’s shoulder impacted on mother’s pubic symphysis). According to Dr. Aron’s deposition testimony (which is substantially corroborated by his prog *505 ress note and by the Labor Progress Note prepared by the attending nurse), he addressed this by (1) having the head of the bed flattened, (2) instituting the McRoberts maneuver (mother’s hips are hyperflexed back with the help of nurse(s)), and (3) then attempting to deliver the baby’s posterior arm. When the posterior arm would not deliver, Dr. Aron (4) ordered suprapubic pressure (downward external pressure applied behind the mother’s pubic bone in an attempt to dislodge the baby’s shoulder) and, this proving unsuccessful, (5) performed a Woods maneuver (pushing the baby’s anterior shoulder toward her chest and the posterior shoulder toward her back). This worked, and Angelina was delivered about two minutes after the shoulder dystocia was diagnosed.
The steps that Dr. Aron described are all recommended modes of addressing shoulder dystocia, a medical emergency which must, for the health of both baby and mother, be resolved within four to five minutes. Nonetheless, the delivery team noted that on the warming table Angelina’s left arm tended to stay at her side, with decreased spontaneous movement and muscle tone. She was diagnosed with Erb’s Palsy, a paralysis of the upper arm resulting from injury to the brachial plexus nerve. She underwent physical therapy as an infant and, at age two, a surgical procedure, but still suffers from limited movement of her left upper arm.
The plaintiff intends to call, as her sole expert on negligence and medical causation, Dr. Stuart Edelberg, a board-certified obstetrician-gynecologist. His opinions, and the grounds therefor, are set forth in the Joint Pretrial Memorandum as follows:
Dr. Edelberg may be expected to testify that in 2001 the accepted standard of care required the average qualified obstetrician faced with shoulder dystocia to use gentle traction in delivering a baby. It has never been accepted practice to apply excessive traction to facilitate a difficult delivery. It is Dr. Edelberg’s professional opinion to a reasonable degree of medical certainly that a severe brachial palsy, in the presence of a shoulder dystocia, is more likely than not caused by excessive downward lateral traction during a delivery.
Dr. Edelberg may be expected to testify generally about shoulder dystocia, the causes of shoulder dystocia, Erb’s palsy, and the causes of Erb’s palsy. Dr. Edelberg may be expected to describe for the juiy the findings that one would be expected to see if the Erb’s palsy was caused in útero or by the natural forces of labor. Dr. Edelberg may be expected to testify that Angelina Cardillo was not bom with any findings that would suggest that this was an in útero injuiy or an injury from the natural forces of labor as she descended through the birth canal. Dr. Edelberg may be expected to testify that, in the absence of these findings, the most likely cause of Angelina’s Erb’s palsy is excessive traction from the defendant during delivery. Dr. Edelberg may be expected to testify that Angelina’s injuries to her left arm are permanent.
Dr. Edelberg may be expected to testify, to a reasonable degree of medical certainly, the care and treatment rendered to Angelina Cardillo by Eugene Aron, M.D. on 11/15/01 fell below the standard of care at the time for the average qualified obstetrician when Dr. Aron used excessive traction and force in delivering Angelina. In the presence of shoulder dystocia, Angelina’s brachial plexus injury was, more likely than not, caused by Dr. Aron’s excessive downward lateral traction during delivery.![1]]
B. The Medical Literature
The nature of the connection between shoulder dystocia, the actions of the birth attendant, and Erb’s palsy is a familiar debate, both in testimony in cases tried in this and other courts, and in the medical literature. Both sides have submitted relevant literature — articles from peer-reviewed journals, practice bulletins from the American College of Gynecology and Obstetrics, and a chapter from the Creasy and Resnick textbook — from which several items of consensus emerge.
One is that Erb’s palsy, a rare birth injury, appears disproportionately in births with shoulder dystocia, a similarly rare complication of vaginal delivery in which the baby’s head delivers, but her anterior shoulder[2] gets impacted (stuck) on the mother’s pubic symphysis (the joint at the front of the pelvis).
Shoulder dystocia occurs in 0.24% to 2.00% of vaginal deliveries . . . Infant morbidity related to trauma [in an SD birth] includes brachial plexus and phrenic nerve injuries and fractures of the humerus and clavicle. The most serious traumatic morbidity is brachial plexus injury (Erb palsy), which occurs in 10% to 20% of infants born after shoulder dystocia.
R. Creasy et al., eds., Creasy and Resnik's Maternal-Fetal Medicine: Practice and Principles, 697 (Sixth Ed. 2009). One study found that Erb’s palsy occurred in 21.6% of deliveries with shoulder dystocia, and in just 3 per 1000 deliveries without shoulder dystocia. Gurewitsch et al., “Risk Factors for Brachial Plexus Injury With and Without Shoulder Dystocia," Am.J.Ob.&Gyn. (2006) 194:486-92 at 488-89. A literature review notes that “[approximately one-half of Erb’s palsies occur without concurrent shoulder dystocia,” a result that falls within the same general order of magnitude as the other studies. Sandmire et al., “Erb’s Palsy: Concepts of Causation,” Am.J.Ob.&Gyn. (2000) 95:941-42; accord, Gherman et al., “Spontaneous Vaginal Delivery: A Risk Factor for Erb’s Palsy?” Am.J.Ob.&Gyn. (1998) 178:423-27 at 426. In short: both shoulder dystocia and Erb’s palsy are uncommon conditions, but they are commonly associated.
*506 There is also general acceptance of the proposition that Erb’s palsy can result from application of excessive force to the baby’s neck in an effort to free the impacted shoulder.
Most brachial plexus injuries resulting from shoulder dystocia involve the arm and shoulder that are in the anterior pelvis at the time of delivery. The brachial plexus is believed to be injured when excessive downward traction and lateral extensions of the fetal head and neck occur during the attempt to deliver the anterior shoulder; however, there are exceptions to this cause of brachial plexus injury.
Creasy & Resnick at 697; accord, Gurewitsch at 496 (“stout traction applied during shoulder dystocia (SD) is a well-established mechanism of injury [in brachial plexus palsy cases]”); “ACOG Practice Patterns,” Int.J.Gyn.&Ob. (1998) 60:306-13 at 310 (of injuries associated with shoulder dystocia “(t]he most potentially serious, brachial plexus injuries, can be caused by extreme amounts of traction and flexion exerted on the infant’s neck”); Gherman et al., Brachial Plexus Palsy: An In Utero Injury?” Am.J.Ob.&Gyn. (1999) 180:1303-07 at 1303 (“Acquired brachial plexus injury historically has been linked with excessive fetal traction applied to the fetal head, usually in association with shoulder dystocia”).
This common understanding in the profession has resulted in the standard of care to which Dr. Edelberg is expected to testily.
Conventional wisdom dictates that the most effective treatment includes prompt recognition that delivery of the shoulders will be difficult and avoidance of excessive downward traction on the fetal head when attempting to deliver the anterior shoulder.
Creasy at 697. Rather, accepted practice calls for the McRoberts maneuver, rotation of the baby’s shoulders by the Woods maneuver or a variant, and/or delivery of the posterior arm, then — as a last resort, if the other measures have failed — replacement of the baby’s head into the uterus for delivery by caesarian section. Id. The Creasy text goes on to state, however, that “(s)houlder dystocia culminating in injury that is permanent (1 in 10,000 births) is so rare that all of the recommendations on prevention are based on accumulated wisdom and opinion rather than evidence-based medicine.” Id.
Beginning about twenty years ago, some studies have attempted to address whether, how often, and in what circumstances brachial plexus injury may occur without excessive traction. It is now generally accepted that not all such injuries are the doing of the birth attendant. There are, for example, reported cases of Erb’s palsy in babies delivered by Caesarian section; or following vaginal births apparently uncomplicated by shoulder dystocia (and even, in one case, during a completely spontaneous delivery with no attendants touching the infant[3]); or in babies in which other physical findings and electromyographic findings indicated that the injury occurred before the onset of labor, perhaps due to malposition in útero; or in the “wrong” arm — the posterior (lower) arm, after the anterior arm had impacted. Creasy at 697; Gurewitsch et al., “Risk Factors for Brachial Plexus Injury With and Without Shoulder Dystocia,” Am.J.Ob.&Gyn. (2006) 194:486-92 at 486; Sandmire (2000); Gherman (1998) at 423.
At least one large retrospective study has concluded that brachial plexus injury not associated with shoulder dystocia “is uncommon and likely mechanistically distinct from” cases seen following a diagnosed shoulder dystocia, and that “non-SD-BPP” cases are distinguished by “(r]isk factors, birth weight, fetal acidosis, posterior arm involvement, and injury severity.” Gurewitsch at 486. More specifically: “BPP was 75 times more likely to occur after a SD delivery (21.6%) than a non-SD delivery (3 per 1000),” and over 90% of permanent brachial plexus injuries followed shoulder dystocia. Id. at 488-89. Among non-SD deliveries resulting in BPP, “the residual deficit is nearly always mild, whereas nerve root avulsions and/or complete brachial plexus impairment (C5-C8/T1) occur almost exclusively with antecedent SD.[4]
Of course, none of these studies address whether, in most cases or in any particular case, excessive traction by the birth attendant played a role in causing brachial plexus injuiy associated with shoulder dystocia. This question resists large-scale quantitative analysis, because obstetricians do not typically measure the force applied to the baby’s head and neck during delivery.
To every generality there is an exception, however, and the plaintiff has supplied a study in which a single clinician was fitted, for 29 deliveries, with “tactile-sensing devices” consisting of sensors attached to the fingertips that measured the force that the clinician applied to the fetal head, and fed the data to a microcomputer which processed and recorded it. Allen, et al., “Risk Factors for Shoulder Dystocia: An Engineering Study of Clinician-Applied Forces,” Ob.&Gyn. (1991) 77:352-55. Of the 29 cases, twenty were routine deliveries, two were shoulder dystocias, and seven were otherwise “difficult.” The average force applied in the shoulder dystocia deliveries was significantly higher than that in normal deliveries (43.04 vs. 23.40 Newtons), as was the peak force (99.89 vs. 46.68 Newtons) and the peak rate of force (223.54 vs. 82.33 Newtons/second). Id. at 354.[5]
Also of interest is a finding in the Gurewitsch study (p. 490):
that temporary BPP associated with SD was highly correlated with clinicians in training completing SD deliveries that were classified as mild by objective criteria. This may reflect a supervising clinician’s difficulty in assessing the amount of traction exerted by a trainee and/or the trainee’s inexperience *507 at recognizing milder SD at its onset. Such factors may have increased the risk for injury; fortunately, the effect was transient.
See also Gherman (1999) (finding no correlation between Erb’s palsy and the level of a physician’s obstetric experience, but a 3-to 4-fold increase in risk for deliveries attended by a midwife, nurse, corpsman, or osteopath).
So: based on the medical literature, read responsibly and in the light most favorable to the plaintiff, a properly qualified expert might conclude that although some — perhaps half — of Erb’s palsy cases occur in the absence of shoulder dystocia, such instances are rare in proportion to the overall number of non-SD deliveries, but much more common in SD deliveries; and that the mechanism of injury in cases of Erb’s palsy associated with shoulder dystocia is probably, in some cases, traction applied by the birth attendant. This is, as noted above, the conventional wisdom and, as I read the literature, still generally accepted.
There have emerged, however, a list of alternative, mutually non-exclusive explanations in the medical literature for the high correlation between shoulder dystocia and Erb’s palsy. Births with both of these complications also have higher-than-average incidences of fetal macrosomia (high birth weight), which is a risk factor for shoulder dystocia; maternal diabetes, which correlates with increased bisacromial diameter (width through the shoulders) another risk factor for shoulder dystocia; fetal acidosis, which can cause poor muscle tone in the fetus; and/or very rapid (under fifteen minutes) second-stage labor.[6] One study makes the connections as follows:
No specific pattern of prenatal events appears to be reliably predictive of Erb’s palsy. Moreover, as many as 50% of brachial plexus injuries may be attributable to unavoidable intrapartum or antepartum events and not to shoulder dystocia. Many of the factors that predispose to shoulder dystocia may place increased tension on the brachial plexus before delivery of the fetal head. For example, fetal macrosomia, an increased bisacromial diameter, and precipitate labor with failure of truncal rotation all result in persistent anteroposterior [pubis to sacral promontory; the narrow dimension of the interior of the pelvis] alignment of the fetal shoulders at the pelvic inlet. Impaction of the fetal shoulder behind the symphysis pubis subsequently ensues, with uterine contractions and maternal convulsive efforts subjecting the anterior brachial plexus to excessive stretch.
Id. at 426; see also Gherman (1999). Addressing the acidosis issue, the authors of another study suggest that “[d]ecreased muscle tone associated with acidosis may adversely affect fetal posture and the requisite motion that would reorient the fetus’s head, neck, and
shoulder region relative to the maternal pelvic architecture during descent.” Gurewitsch at 490-91.
According to the authors of a retrospective review of the literature on the subject, “[i]t is now time to suggest that all of the ... indirect evidence establishes the maternal propulsive forces as the most likely cause of Erb’s palsy.” Sandmire et al., “Erb’s Palsy Causation: A Historical Perspective,” Birth (2002) 29:52-54 at 54. This and other publications, while they inhabit the medical literature, have carried the discussion more frankly into the medico-legal arena. See, e.g., Creasy at 697 (concluding, from the fact than brachial plexus injury can occur without shoulder dystocia, that “[t]he presence of a permanent injury does not imply that the delivering clinician applied excessive force despite the res ipsa loquitur argument seen in so many torts arising from these births”) and Sandmire (2000) (“Is it not time to stop blaming the birth attendant for most of the Erb’s palsy cases? The indirect evidence presented here supports the propulsive nature of the stretching of the nerves involved”).
DISCUSSION
Holmes famously asked Watson, “How often have I said to you that when you have eliminated the impossible, whatever remains, however improbable, must be the truth?” A.C. Doyle, The Sign of Four (1890), Ch. 6. A variant of this principle is known to the medical profession as differential diagnosis. Another variant is referred to in the law as res ipsa loquitur.
In any negligence case, “(w]hile a plaintiff need not show the exact cause of the accident or exclude all other possible causes, he must show that there is a greater probability than not that the accident resulted from the defendant’s negligence.” Enrich v. Windmere Corp., 416 Mass. 83, 87 (1993). Ordinarily, “[t]he mere happening of an accident does not establish negligence on the part of the defendant.” Olofson v. Kilgallon, 362 Mass. 803, 805 (1973). The res ipsa doctrine, however,
permits a trier of fact to draw an inference of negligence in the absence of a finding of a specific cause of the occurrence when an accident is of the kind that does not ordinarily happen unless the defendant was negligent in some respect and other responsible causes including conduct of the plaintiff are sufficiently eliminated by the evidence. See Restatement (Second) of Torts §328D(l)(a) (1965) . . . The jury must be able to find, either by expert evidence or by their own common knowledge, that the mere occurrence of the accident shows negligence as a cause.
Enrich v. Windmere Corp., 416 Mass. 83, 88 (1993) (some citations omitted).
The res ipsa rule is merely an application, not an alteration, of the familiar rules governing burden of proof, circumstantial evidence, and reasonable inferences in civil cases. “A res ipsa loquitur case is ordi *508 narily merely one kind of case of circumstantial evidence, in which the jury may reasonably infer both negligence and causation from the mere occurrence of an event and the defendant’s relation to it.” Restatement (Second) of Torts §328D, comment b (1965).
The plaintiffs burden of proof requires him to produce evidence which will permit the conclusion that it is more likely than not that his injuries were caused by the defendant’s negligence. Where the probabilities are at best evenly divided between negligence and its absence, it becomes the duly of the court to direct the jury that there is not sufficient proof. The plaintiff need not, however, conclusively exclude all other possible explanations, and so prove his case beyond a reasonable doubt. Such proof is not required in civil cases, in contrast to criminal cases. It is enough that the facts reasonably permit the conclusion that negligence is the more probable explanation. This conclusion is not for the court to draw, or refuse to draw, in any case where either conclusion is reasonable, and even though the court would not itself find negligence, it must still leave the question to the jury if reasonable men might do it.
Id., comment e. Or, as Justice Holmes more succinctly put it: “What is meant by res ipsa loquitur is that the jury are warranted in finding from their knowledge, as men of the world, that such accidents usually do not happen except through the defendant’s fault, and therefore in inferring that this one happened through the defendant’s fault, unless otherwise explained.” Pinney v. Hall 156 Mass. 225, 225-26 (1892).[7]
Massachusetts stands apart from some jurisdictions in permitting the res ipsa loquitur doctrine to be deployed in cases (including medical malpractice cases) in which expert testimony is needed to eliminate causes other than negligence. Edwards v. Boland, 41 Mass.App.Ct. 372, 377-80 (1996) (res ipsa instruction warranted where plaintiffs expert testified that severing of femoral artery and nerve during knee ligament replacement was “an event that would not take place without a departure from the normal standard of care on behalf of the surgeon or a member of the operating team”; noting contrary rule in some other jurisdictions). Indeed, it was the lack of expert testimony eliminating causes other than negligence that led the SJC in Enrich to affirm a directed verdict for the defendant, res ipsa notwithstanding. 416 Mass. at 88-89.
It scarcely needs adding, however, that where the issue is one beyond the competence of a lay jury, there must be expert testimony, and that such testimony must meet the usual standards of foundation and reliability. The defendant’s motion therefore addresses itself to the trial judge’s “gatekeeper” function in determining the reliability, and hence admissibility, of expert testimony. See Commonwealth v. Patterson, 445 Mass. 626, 639 (2005) (“Trial judges serve a gatekeeper function with respect to expert opinion testimony based on specialized knowledge. ‘If the process or theory underlying [an] . . . expert’s opinion lacks reliability, that opinion should not reach the trier of fact’ ” (citations omitted)). The burden is on the proponent of the expert testimony to “show that it is generally accepted or otherwise reliable to support [the] relevant conclusion). Palandjian v. Foster, 446 Mass. 100, 112 n.17 (2006), citing Canavan’s Case, 432 Mass. 304, 314 (2000).
With the SJC’s adoption and adaptation of the U.S. Supreme Court’s Daubert decision in Commonwealth v. Lanigan, 419 Mass. 15 (1994), there are
five factors that a judge should consider in determining the reliability of proposed scientific evidence. The five factors are whether the scientific theory or process (1) has been generally accepted in the relevant scientific community; (2) has been, or can be, subjected to testing; (3) has been subjected to peer review and publication; (4) has an unacceptably high known or potential rate of error; and (5) is governed by recognized standards.
Commonwealth v. Powell, 450 Mass. 229, 238 (2007), citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593-94 (1993). While general acceptance (the old PVye[8] test) is no longer the sole avenue for demonstrating reliability, “general acceptance in the relevant. . . community will continue to be the significant, and often the only, issue.” Lanigan, at 25.
Turning back, then, to the present case: at least until the last twenty years or so, excessive fetal traction was generally accepted as the presumptive cause of brachial plexus injury. Indeed, it is still generally accepted as a cause, though not necessarily the only cause. All of the research provided to me and referenced above has been submitted for peer review and published; most of it is evidence-based in whole or in part; error rates as to some issues may be difficult to quantify, [9] but the research appears, for the most part, to have followed clearly delineated protocols such as are typical in the field.
The prominent exceptions are the two Sandmire articles, both of which cross the line separating dispassionate scientific research from advocacy. It is one thing to say that “not all Erb’s palsies are traction related” (Gherman (1998) at 426); the research amply supports this. It is another to cite the evidence that half of all brachial injuries occur without shoulder dystocia, that a few occur in the posterior arm, and that a significant minority follow a precipitous second-stage labor, and then conclude categorically that “Erb’s palsy results from the forces of propulsion and occurs before shoulder dystocia.” Sandmire (2000) at 942; accord, Sandmire (2002) at 54 (“It is now time to suggest that all of the preceding indirect evidence establishes the maternal propulsive forces as the most likely cause of Erb’s palsy. This is true for cases with and without associated shoulder dystocia. Thus ends *509 the long journey leading to an improvement in the scientific understanding of the forces responsible for brachial plexus injuries”; emphasis supplied). By the same logic, it can be demonstrated that not all motor vehicle accidents involve alcohol; therefore, none do.
On firmer ground, at least methodologically, is Dr. Edelberg’s approach to the case. As his testimony has been proffered, Dr. Edelberg will “describe for the jury the findings that one would be expected to see if the Erb’s palsy was caused in útero or by the natural forces of labor,” then “testify that Angelina Cardillo was not born with any findings that would suggest that this was an in útero injuxy or an injury from the natural forces of labor as she descended through the birth canal,” and that, “in the absence of these findings, the most likely cause of Angelina’s Erb’s palsy is excessive traction from the defendant during delivery.” Joint Pretrial Memorandum at 7.
In short: Dr. Edelberg proposes a differential diagnosis. Although Angelina was a big baby — a risk factor for shoulder dystocia and therefore for Erb’s palsy— neither side suggests that she suffered from fetal acidosis, or that the mother was diabetic. Perhaps most importantly, the second-stage labor was an hour and three-quarters, slightly shorter than average for a first delivery but nowhere near the fifteen-minute mark that would rank it as precipitate and therefore as a risk factor for Erb’s palsy.
Differential diagnosis is at the heart of medical problem-solving. As a colleague has written;
“Courts have insisted time and time again that an expert may not give opinion testimony to a jury regarding specific causation if the expert has not engaged in the process of differential diagnosis.” Rutigliano v. Valley Business Forms, 929 F.Sup. 779 (D.N.J. 1996), aff'd, 118 F.3d 1577 (3d Cir.). Indeed, in the Daubert case itself the Supreme Court demanded that the expert “explain how ... he was able to eliminate all other potential causes of [the] birth defects.” Daubert, 43 F.3d [sic] at 1319. See also In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 759 n.27 and 760 (3rd Cir.1994). This does not mean that a medical causation expert must eliminate all possible causes of an alleged condition, Claar v. Burlington Northern R.R., 29 F.3d 499, 502 (9th Cir.1994), nor does it mean that the expert must always make a physical examination of the plaintiff or conduct a battery of tests aimed at eliminating competing causes of the plaintiffs condition. In re Paoli at 762. Nevertheless it is true that “[a]t the core of differential diagnosis is a requirement that experts at least consider alternative causes — this almost has to be true of any technique that tries to find a cause of something.” In re Paoli at 759.
Hammond v. Bedford Great Road CVS, Inc., 1998 WL 1181740 (Mass.Super. 1998; Neel, J.) [9 Mass. L. Rptr. 104).
As far as can be determined at this stage of the proceedings, at least, Dr. Edelberg’s approach to the problem presented in this case passes muster. His opinion — that if other known causes are ruled out, a brachial plexus injury is probably the result of excessive traction — appears to be, if not a necessary interpretation of the literature, at least a reasonable one, and consonant with both the Daubert-Lanigan standard and the Massachusetts doctrine of res ipsa loquitur.
I acknowledge that at least five Erb’s palsy cases from other jurisdictions — in two of which Dr. Edelberg testified for the plaintiff — have looked unfavorably on the inferential approach. Three are readily are distinguishable from this case. In Hawkins v. OB-GYN Assocs., P.A., 290Ga.App. 892, 660 S.E.2d 835 (2008), the court held that Dr. Edelberg’s testimony ruling out alternative causes did not get the case to the juiy, because “Georgia courts . .. have expressly ruled that the doctrine of res ipsa loquitur does not apply in a malpractice case.” (Citation omitted.) In Salvant v. State, 935 So.2d 646 (La. 2006), the appellate court affirmed the trial judge’s decision for the defendant in ajuiy-waived trial, holding that the judge as factfinder was entitled to credit defense witnesses concerning alternative causes. And in Brown v. Baptist Memorial Hospital, 806 So.2d 1131, 1135 (Miss. 2002), the court upheld the trial judge’s refusal to charge the jury on res ipsa, noting that for the doctrine to apply under Mississippi law, “the matter must be within the common knowledge of laymen . . . [t]he causes of Erb’s Palsy are not within the common knowledge of laymen.” We are here concerned with the admissibility of expert testimony — not whether the factfinder might legitimately credit defense evidence to the contrary— and we address this issue in a jurisdiction that permits application of the res ipsa doctrine in medical negligence cases.
The other two cases require a somewhat more detailed look at the reviewing court’s account of the trial evidence. In Mundell v. La Pata, 263 Ill.App.3d 28, 635 N.E.2d 933 (1994), the court affirmed a directed verdict for defendant on the plaintiffs res ipsa count. In part, it found fault with the opinion question to the plaintiffs expert, which failed to distinguish between uncomplicated deliveries and those involving shoulder dystocia. As to the latter, the court noted that the expert, a Dr. Masterson,
testified that brachial plexus injuries were possible in a birth involving shoulder dystocia even if the delivery physician addressed the shoulder dystocia in a nonnegligent manner. In fact, his testimony indicates that the incidence of shoulder dystocia in all pregnancies is 17 in 10,000 or .17%; however, in macrosomic infants, like [the plaintiff] Maureen, the incidence of shoulder dystocia is 2,000 in 10,000, or 20%. Brachial plexus injuries occur in roughly 20% of macrosomic babies and less than *510 1% of nonmacrosomic babies. Dr. Masterson’s testimony shows that in deliveries involving shoulder dystocia, brachial plexus injuries are not an uncommon occurrence because most shoulder dystocia and brachial plexus injuries occur in macrosomic babies. Thus plaintiff did not establish, either by directly posing the res ipsa question to Dr. Masterson, or by statistical evidence, that brachial plexus injuries do not ordinarily occur absent negligence in a birth involving shoulder dystocia.
263 Ill.App.3d at 37. In this case, by contrast, the plaintiff has promised that Dr. Edelberg will address and rule out alternative causes.
In Johnson v. St. Barnabas Hosp., 52 A.D. 286, 860 N.Y.S.2d 40 (2008), the trial court held that Dr. Edelberg’s testimony that “since this baby does have an injury, I know that excessive traction was used” did not warrant submitting the case to the jury on a res ipsa theory. The Appellate Division agreed, saying:
Dr. Edelberg admitted that it was very well known that brachial plexus injury could occur even when the appropriate maneuvers are correctly used to resolve shoulder dystocia, and that the occurrence of a brachial plexus injury does not mean incorrect procedures or techniques were used . . . [Pjlaintiffs expert failed to establish that the injuries at issue would not occur in the absence of negligence. Dr. Edelberg testified on cross-examination that there are causes for a brachial plexus injury other than excessive traction. The first element of res ipsa loquitur, i.e., that negligence may be inferred from the mere happening of the event, was not established. The testimony of plaintiffs’ expert only provided possible explanations for the injury sustained by the infant plaintiff.
52 A.D.2d at 287-88 (citation omitted; emphasis supplied). From the italicized sentence in this passage, it seems that the Appellate Division imposed, as a matter of New York law, a higher res ipsa threshold than the Massachusetts “does not ordinarily happen” standard; or it may be that Dr. Edelberg did not address, or was unable to rule out, alternative causes in that case, as the plaintiff has represented he will do in this case.
Dr. Edelberg’s proffered testimony is therefore admissible. In so ruling I do not, of course, equate his conclusions with scientific fact; nor would I preclude properly supported testimony from a defense expert who reached the opposite conclusion.
[I]t is to be remembered that the trial judge’s “gatekeeper” assessment of such expert medical evidence for purposes of determining its admissibility is a preliminary one. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. at 592-93. The judge’s ruling “is not final on the reliability of the [expert] opinion evidence, and the opponent of that evidence may challenge its validity before the trier of fact.” Commonwealth v. Lanigan, 419 Mass. at 26. “Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.” Daubert, supra at 596.
Higgins v. Elevator Service Corp., 45 Mass.App.Ct. 643, 648 (1998).
ORDER
For the foregoing reasons, the Defendants’ Motion to Preclude Testimony of Plaintiffs Expert Stuart Edelberg, M.D. Based on Daubert v. Dow Chemical and Commonwealth v. Lanigan is DENIED. This ruling, which followed a non-evidentiary hearing only, is of course without prejudice to a motion to strike, a motion for directed verdict, or other appropriate remedy should it appear that Dr. Edelberg’s trial testimony has fallen short in any respect.

The defendants have not asserted that the disclosure is insufficiently detailed, and I note that for a medical malpractice case — in which the medical record is usually finite and counsel for both sides are capable, experienced, and familiar with the subject matter (and often with the other side’s experts) — both the level of detail and the lack of complaint are typical.

The terms “anterior” and “posterior,” applied to the baby’s shoulders, take the mother’s body as their point of reference. If the mother is positioned on her back and the baby delivers facing one side or the other, the baby’s upper shoulder corresponds with the mother’s front, and is thus the “anterior” shoulder.

See the discussion below of precipitate second-stage labor as a risk factor for brachial plexus injury.

The Gherman (1998) study (at 425), by contrast, found that “Erb’s palsies without shoulder dystocia took longer to resolve and were more likely to persist at age 1 year” than were the cases associated with shoulder dystocia.

Of the two shoulder dystocia deliveries, one baby suffered a broken clavicle and a transient Erb’s palsy; the other was uninjured. The peak force rate applied to the injured baby was “considerably higher” than in the other SD delivery. Allen at 354.

The second stage of labor begins with complete cervical dilation and ends with the birth of the baby.

In this, Justice Holmes differed from his cousin and contemporary, Sherlock, who would eliminate alternative causes only if they were “impossible,” not merely unusual. Justice Holmes’s formulation, as noted above, better suits the preponderance standard applicable in a civil case than does Sherlock’s aphorism regarding the investigation of crimes.

Frye v. United States, 293 F. 1013 (D.C. Cir.1923).

For example, the articles frequently mention, but do not (because they cannot) resolve, the important question of whether or not cases of so-called “non-SD BPP” are actually instances of missed or unreported shoulder dystocia. E.g., Gurewitsch at 490; Gherman (1999) at 426-27.